**DISSENT; and Opinion Filed December 10, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00235-CR

**CHRISTOPHER DANIEL DUNTSCH, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause No. F15-00411-L**

## DISSENTING OPINION
Before Justices Lang, Fillmore, and Schenck
Dissenting Opinion by Justice Schenck

As both parties acknowledged at argument, this is a test case as to the application of penal code section 22.04 to the practice of medicine. The jury found appellant guilty of intentionally or knowingly causing an elderly individual to suffer a serious bodily injury. TEX. PENAL CODE ANN. § 22.04(a)(1). At the time of the charged offense, appellant was a licensed medical doctor performing a medical procedure. While both parties are well represented, neither party has been able to cite us authorities applying section 22.04—or any other like criminal proscription—aimed at the myriad of harms that might result from the provision of medical treatment. Meanwhile, appellant's counsel brings forward a series of challenges to the conviction, some broad and some very focused. The majority opinion does an excellent job of recounting the facts and applying the

governing law, such as it is, to this unusual situation. I ultimately disagree in certain respects with the result, so I write separately.

While appellant has not shown the trial court abused its discretion in admitting evidence of his prior unsuccessful surgeries, neither that evidence nor other evidence admitted at trial to prove his culpable mental state is sufficient to sustain his conviction for *knowingly* or *intentionally* causing serious bodily injury to his patient. Instead, the evidence is sufficient to support a finding of a lesser culpable mental state, so I would reform the judgment accordingly. *See Thornton v. State*, 425 S.W.3d 289, 299–300 (Tex. Crim. App. 2014). Further, this case raises important policy concerns for the practice of medicine, as appellant urges, that are addressed in the second section of this opinion, although those arguments are beyond the competence and reach of the courts. Rather, such concerns are presently in the hands of district and county attorneys and, ultimately, the Texas Legislature.

## I.     What Did the State Prove with Respect to Appellant's Mental State?

Generally, a culpable mental state is essential to any criminal charge. Appellant was indicted, tried and charged along a scale from negligence through intentionally or knowingly causing serious bodily injury. The jury returned a verdict at the highest level of culpability, finding that appellant intentionally or knowingly produced the result. This is not a civil medical malpractice case requiring a plaintiff to establish by a preponderance of the evidence that a doctor was negligent. While it is frighteningly dangerous, it is in itself not a crime to be both a doctor and an incompetent or, worse, an overconfident incompetent. The State surely proved both of those things as to appellant. The immediate question is whether the State carried its burden of producing proof "beyond a reasonable doubt" that appellant at least *knew* he was inflicting harm, not that he *should have known* of his own incompetence. The record does not support a finding of knowing.

The statutory definitions that control the State's burden begin with "criminal negligence" (a state jail felony), which asks whether "the defendant *ought to* have been aware of a substantial and unjustifiable risk of such a nature that his failure to perceive it constitutes a gross deviation from the reasonable standard of care." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "Reckless," a second-degree felony, meanwhile, requires proof that the defendant actually foresaw the risk involved and consciously decided to ignore it. *Id.* at 751. Mere lack of foresight or thoughtlessness, "however serious the consequences," do not suffice to constitute either culpable negligence or recklessness. *Id.*

Proof of either "intentionally" or "knowingly" causing serious bodily injury raises the offense to a first-degree felony. A person acts "intentionally" with respect to a result of his conduct when it is his conscious objective or desire to cause it. PENAL § 6.03(a). A person acts "knowingly" with respect to a result of his conduct when he "is aware that his conduct is *reasonably certain* to cause the result." *Id.* § 6.03(b) (emphasis added). The distinction between "knowing" and "intentional" is narrow—best described as the difference between one who wills a particular result and one who is simply willing for it to occur by his conduct.[1] *Koah v. State*, 604 S.W.2d 156, 160 n.1 (Tex. Crim. App. [Panel Op.] 1980) (citing the practice commentary at section 6.03); *see also Howard v. State*, 333 S.W.3d 137, 139 (Tex. Crim. App. 2011).[2]

The controlling issue here, then, is when does a doctor commit a first-degree felony offense in the conduct of his profession? The State charged appellant with "malpositioning an interbody device . . . and pedicle screws" and using a "deadly weapon, to wit [his] hands and surgical tools .

---

[1] Dr. Kevorkian intended to produce the death of his patients. Doctors performing experimental surgery or prescribing the off-label use of medications may know that death or bodily injury is reasonably certain to follow.

[2] While I have been unable to locate any opinion from the court of criminal appeals that directly affirms that our "knowingly" definition poses a subjective standard in the context of a result-oriented offense, several courts from other jurisdictions that apply the same Model Penal Code definition have concluded that whether a defendant has knowledge or acts knowingly is a subjective inquiry. *See, e.g.*, *ARCTEC Servs. v. Cummings*, 295 P.3d 916, 923 (Alaska 2013); *People v. Bryant*, No. 15CA0121, 2018 WL 1959640, at *14 (Colo. App. Apr. 19, 2018); *State v. Dixon*, No. 82951, 2004 WL 1067527, at *2 (Ohio Ct. App. May 13, 2004); *State v. Elliott*, 663 N.E.2d 412, 418 (Ohio Ct. App. 1995); *State v. Sargent*, 594 A.2d 401, 402 (Vt. 1991).

. . ." And, it tried this case on the theory that appellant knew or should have known that his skills and technique were so deficient that some serious harm to his patient was likely. The State showed that appellant acted with criminal negligence and, though a closer question, recklessly in that the evidence shows that appellant knew or should have known that he was unable to perform the procedure without a high degree of risk of harm. The State did not prove he intended the result or actually knew what he was doing was reasonably certain to result in injury. On the contrary, the proof shows all too clearly that appellant did not know what he was doing and that he was wholly lacking in the kind of self-awareness that would support a finding that, by operating on a patient, he knew he was "reasonably certain" to do more harm than good.

A. Appellant's Knowledge Was Unproven at Trial

The State essentially concedes that there is no evidence that appellant actually intended to cause the harm, leaving us to explore the concept of "knowing" and the proof to support it.[3] As noted above, a person acts "knowingly, or with knowledge," with respect to the result of his conduct when he is actually "aware that his conduct is reasonably certain to cause the result," but proceeds despite that knowledge. PENAL § 6.03(b); *see also* MODEL PENAL CODE § 2.02(b) (providing a person acts "knowingly" when the element involves a result of his conduct as when he is "aware that it is practically certain that his conduct will cause such a result"). In support of the conclusion that appellant knew the complainant Ms. Efurd's drop foot or some other seriously negative outcome[4] was reasonably certain, the State points to evidence (1) suggesting that appellant's past surgeries and concerns raised to him about them support the inference that he knew that his surgical efforts were reasonably certain to cause the complainant serious bodily

---

[3] The State's brief before us offers no argument to support the conclusion that appellant intended to injure Ms. Efurd. While it declined to say that it had abandoned that possibility at oral argument, it was also unable to develop it.

[4] The parties do not focus on whether the "result" here would be the particular negative outcome Ms. Efurd suffered or a more general unknown negative result that would be the product of ineptitude. Given the State's theory that appellant proceeded to operate despite evidence of his incompetence (rather than having a particular goal of harm in mind), I will assume the latter would be sufficient.

injury and (2) objections voiced to him by others in the operating room during the course of the surgery on the complainant.

> 1. Evidence Concerning His Prior Surgeries, While Perhaps Admissible, Shows What Appellant Should Have Known, Not What He Did Know, About His Skills

To show that appellant knew the outcome of this procedure would be injurious, the State, over strenuous objection by appellant's counsel, introduced evidence of five prior medical procedures he performed that left patients with bodily injury or death, including, but not limited to, two deaths and one instance of quadriplegia. The State, in fact, candidly conceded below that there is little evidence of appellant's culpable mental state prior to the surgery other than his own knowledge of these prior negative results.

Appellant, meanwhile, urges the admission of these prior procedures violates rule 404(b) of the Texas Rules of Evidence. To get past that argument, the State urges that this evidence is probative of his knowledge of his own incompetence and does not impermissibly confuse or prejudice the jury—suggesting that a juror, crediting this evidence as persuasive and probative of appellant's knowledge (and disregarding its improper prejudicial effect) might conclude that appellant should not have even begun the procedure. To further complicate matters, appellant notes that insofar as the evidence is said to be probative of his knowledge—as opposed to any intent to cause harm—the jury was instructed not to consider the past surgeries except insofar as they related to intent or the absence of mistake.[5]

I will address the issue as one of sufficiency before I address its admissibility. *See Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993) (sufficiency review embraces all evidence jury received, rightly or wrongly).

---

[5] Absence of accident or mistake could properly be taken to leave jurors free to consider the evidence for lower mental states than intentional or knowing conduct.

–5–

As the State acknowledged at trial, evidence of the prior mishandled surgeries was critical to its effort to establish appellant's culpable mental state, as alleged in the indictment, that with respect to the prospect of inflicting harm through his operation he was (1) negligent, (2) reckless, or (3) knew or intended it. But the jury had no information as to how many total procedures appellant had performed. While jurors heard that in the four months between losing privileges at Baylor Plano and gaining privileges at Dallas Medical Center ("DMC"), appellant did not perform any surgeries, the State offered no evidence of the total number of procedures appellant performed during the period that yielded the five negative results prior to his procedure on Ms. Efurd. Likewise, jurors heard testimony from other doctors to the effect that some of the complications appellant experienced were "extremely rare" and that a trained neurosurgeon should have known of his difficulties. Critically, however, to secure a first-degree felony conviction, the State needed proof that appellant knew he was so incompetent that he was "reasonably certain" to hurt the complainant.[6]

As discussed in the majority opinion, Dr. Bagley testified as an expert for the defense and was cross-examined by the State regarding his review of appellant's surgeries.

> Q. And he had a high rate of patients coming back after their surgeries complaining of new neurological problems.
>
> A. Again, the rate, I can't say because I only reviewed specific records. But that was a lot of patients, for the time. But I don't know what the denominator is. I don't know how many patients it's out of.
>
> Q. I mean, I'm just asking the questions out of the patients that you have reviewed.
>
> A. Yes, ma'am. But I'm saying, in terms of just being technical, in terms of a rate, that means you've got to know out of how many. So that's why I kind of qualified that. But, yes, there were a number of patients.

---

[6] Indeed, the same proof of appellant's incompetence and lack of self-awareness that might be used to show that appellant acted recklessly or negligently undermines the State's argument that he was acting with conscious knowledge.

Despite being confronted with the issue during the cross-examination of one of the medical doctor experts, the State never brought forward any evidence to tell the jury how many procedures appellant had performed prior to the surgery on Ms. Efurd. If it had come forward with proof, for instance, that appellant had five cases ending in serious bodily injury, with 11 performed in total, the evidence would at least suggest a probability of serious bodily injury approaching the toss of a coin. But, even with a pattern of 50-50 (or coin toss) results, a juror could not reasonably conclude that appellant was aware that serious bodily was "reasonably certain" to occur.[7] To answer otherwise reduces the statutory text below its plain meaning and ignores the evidence before the jury about what appellant thought about himself and his skills.

Of course, appellant challenges the admissibility of this evidence in the first instance, urging that it violates Texas Rule of Evidence 404(b). Before trial, the State did offer evidence of the total number of procedures in its brief in support of admission of this evidence. There, the State pointed to evidence that appellant performed 22 procedures before his procedure on Ms. Efurd.[8] The State urged to the trial judge that there were more complications, but what the jury heard were 5 serious complications prior to Ms. Efurd's procedure.

Under the case law applying rule 404(b), the State was obliged to show the extraneous surgeries were relevant to a material, non-propensity issue. *See De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). The admissibility of this evidence is a very difficult question only if the State had charged appellant with only an intentional or knowing infliction of injury; 5 negative outcomes out of 22 surgeries (appellant's history prior to his procedure on Ms. Efurd) is bad even in a highly challenging field like neurosurgery, but it falls so far short of establishing

---

[7] While I don't believe the evidence would be sufficient to support the conviction for knowingly inflicting harm, or even admissible for that purpose, I do believe the evidence of some recent bad results would be probative of lesser, objective degrees of mental state as I discuss below.

[8] In its pretrial Notice of 404(b) Evidence, the State identified 49 total procedures performed by appellant, from which the 5 cases (in addition to Ms. Efurd's) identified at trial were gleaned. Ms Eford's July surgery was the 23rd procedure performed by appellant.

even a probability or, more to the point, a "reasonable certainty" as to the results of the next procedure as to hover on the edge of admissibility for purpose of showing actual knowledge that harm is reasonably certain. But, the trial here was not limited to the question of what harm appellant actually knew to be reasonably certain, but also encompassed what he should have known for purposes of the State's negligence theory. While 5 bad outcomes out of 22 may not make (or even be sufficiently probative of whether) a particular result "reasonably certain," the particulars of those cases, as the majority points out, would put a reasonable person on notice of a disconcerting degree of risk to all of his patients, if not any particular one. It suffices, for purposes of the State's criminal negligence charge that the evidence tended to show that appellant "*ought to have been aware of a substantial and unjustifiable risk.*" *Williams*, 235 S.W.2d at 750. The court, therefore, did not abuse its discretion in allowing the jury to hear that evidence.[9]

## 2. Evidence of Criticism and Doubts Raised to Appellant as a Result of the Prior Surgeries

Although the jury did not hear any evidence concerning the number of total surgeries appellant had performed in connection with the 5 prior surgeries it highlighted at trial, it did hear testimony confirming that appellant had received strong criticism from other doctors and had suffered a temporary suspension of his privileges while 2 of the cases that resulted in serious complications were under peer review. The jury also heard that several of those complications were quite rare and that a person trained as a surgeon should have known that these surgical results signaled a general lack of adequate training or competence. That evidence is most pointed in the testimony of Dr. Bagley highlighted by the majority:

Q:     These things don't just happen all the time, on a regular basis?

A:     Yes, ma'am.

---

[9] As noted, I also agree with the majority that the court's limiting instruction that accompanied this evidence allowed the jury to consider this evidence as it related to any of the charged mental states.

Q: So it's highly unusual that a surgeon would have all of these extremely rare complications in a very short period of time. Would you agree?

A: Extremely. Yes, ma'am.

Q: And even a surgeon who wants to say they're poorly trained—when a patient is complaining of new pain over and over again, multiple patients, you start to know that you're hurting people.

A: I would hope so. Yes, ma'am.

Viewed as a whole and in the light most favorable to the judgment, the evidence supports the conclusion that at the time he performed the surgery on the complainant, appellant was aware of five complications out of an unknown total patient population, that he had been rebuked by another doctor who opined that "he was going to hurt somebody" at some point, and had been accused of causing injury to other patients in the past. This evidence speaks to what appellant, as a trained neurosurgeon, *should* have known about the risk he posed generally, as would any evidence of past deficient performance, but says nothing about the probability of harm to any particular patient, most importantly Ms. Efurd.

Appellant was not on trial for being a doctor generally or, more to the point, for being a doctor who lacked adequate training or technique—neither of those things is a crime. And, criminal trials are not reverse class actions. That appellant had been accused of (or was being investigated for) errors causing injuries to patients in the past is clear as is the notion that neurosurgery as performed by him appeared to pose elevated risks, but the State made no effort to quantify that risk or to apply it to the crime for which he was charged. It did not ask Dr. Bagley, for example, whether he (Bagley) could have said that it was "reasonably certain" that appellant would harm Ms. Efurd or any particular patient. Instead, he simply agreed that he "would hope" that a surgeon who had experienced a series of rare complications would start to know that he was "hurting people"—the how many, and how often that would support elevating this case into a crime, rather than a civil malpractice case, was left utterly unaddressed.

–9–

Under our existing case law, even a driver involved in a fatal accident who, prior to the accident, failed to take prescribed anti-epileptic medicine, drove contrary to medical instructions, and drove knowing of his propensity to have seizures would be found to be, at most, reckless in his conduct. *See Robertson v. State*, 109 S.W.3d 13, 19 (Tex. App.—El Paso 2003, no pet.) (indicia of recklessness included acts of failing to take medicine, driving contrary to medical instructions, and driving knowing of propensity to have seizures); *Pugh v. State*, No. 14-09-00492-CR, 2011 WL 175499, at *7 (Tex. App.—Houston [14th Dist.] Jan. 20, 2011, pet. ref'd) (mem. op., not designated for publication) (evidence supported finding of recklessness where defendant drove contrary to medical instructions); *Mungioli v. State*, No. 05-91-00011-CR, 1992 WL 166592, at *5 (Tex. App.—Dallas July 14, 1992, no pet.) (not designated for publication) (holding no error in denying instruction for lesser included offense of criminally negligent homicide where evidence reflected defendant had been told of his seizures). I cannot see how the evidence in this case would show a higher level of mental culpability.

Assuming appellant was obliged to credit the strongest criticism he had received and to agree that he had committed one, two or five episodes of malpractice (though no such finding had been made and he retained his license and surgical privileges) that explained those prior complications, that evidence would show, at most, that he should have been aware of a risk, well below a "reasonable certainty" to any particular patient as necessary to secure a conviction for a first-degree felony. Stated otherwise, I believe this evidence of appellant's results and criticism prior to the surgery for which he was tried is embraced by the penal code's negligence definition in that it showed that "he *ought to* have been aware of a substantial and unjustifiable risk of such a nature that his failure to perceive it constitutes a gross deviation from the reasonable standard of care." Thus, I believe that the evidence, up to the point of his initiating the surgery on Ms. Efurd, would support a verdict of criminal negligence.

Proof that appellant should have been aware of the risks he posed to his overall patient population cannot, in and of itself, support an inference that he knowingly caused harm to any one of them. If knowledge of risk below a "reasonable certainty" were adequate to support an inference of knowing or intentional infliction of harm, the distinctions in the proof requirements would disappear and every criminal negligence case *a fortiori* would be a recklessness or knowing case.

### 3. Evidence of Disagreement in the Operating Room

Of course, the evidence of appellant's prior difficulties was not the only evidence the jury heard about appellant's mental state relative to his surgery on Ms. Efurd. The evidence of appellant's actions during the procedure itself are also important and must be viewed as part of the picture of his mental state and in a light favorable to the jury's verdict. As detailed below, however, I do not believe that evidence, combined with evidence of his history, supports any inference beyond the fact that: (1) appellant knew or should have known that he was deficient generally when he started the procedure; (2) he thought he was doing the procedure correctly in the moment; (3) he knew other professionals thought he was doing the procedure improperly; and, (4) once it was over, he either knew or should have known that he had made mistakes (once again) that harmed a patient. None of that, even when considered together, however, amounts to a first-degree felony. *See Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007) (holding court of appeals erred by considering certain evidence in isolation and not recognizing significance when considered with remaining evidence admitted at trial). Rather, committing one mistake, with actual knowledge or imputed knowledge of past mistakes, makes for a series of mistakes that in this case the jury did not know what frequency or probability.

First, the evidence is clear that during the course of the procedure appellant heard disagreement from others in the operating suite consisting of all of the other medical personnel in the operating room telling him he had misplaced the pedicle screw and the interbody cage. One

–11–

of the nurses, Kissinger, testified that appellant ultimately removed the pedicle screw and began to try to place it in the correct position. Multiple personnel testified that they told appellant he had misplaced the interbody cage by placing it in soft issue rather than bone, but that appellant insisted he could see on the live x-ray images that he had placed it in bone. To that point, Dr. Henderson, who had operated on Ms. Efurd after appellant did, testified that the difference between muscle and bone is one a layperson would know, giving the example of a person knowing to eat the meat of a steak rather than the bone.

The State rightly points to this evidence as highly probative of appellant's mental state in relation to the harm suffered by Ms. Efurd. The problem, however, is that the evidence conclusively shows that appellant, also a licensed physician and the one actually performing the procedure, acknowledged and, at least initially, declared that he believed, contrary to the critique, that he was doing it correctly. Had appellant indicated that he agreed that he was in error and was causing harm and simply continued, this case would look quite different. But, as it stands, the trial record shows an initial disagreement and that appellant later acknowledged the need to remedy his initial placement of the screw, and he maintained the interbody cage was properly placed. Insofar as the initial disagreement is concerned it does not and indeed, for a host of reasons, cannot be sufficient to show a knowing infliction of bodily injury on Ms. Efurd. This evidence cannot support that inference for several reasons. First, appellant acknowledged the concerns of the others present and stated that he disagreed with them, not that he knew that they were right and was going to proceed anyway. The mere presence of a disagreement among and between surgeons and their support staff cannot of itself amount to knowledge or intent to harm the patient where the surgeon holding the scalpel proceeds according to his understanding of the proper course. Were it otherwise, the mere presence of disagreement would make it impossible for a surgery to proceed as no one could safely proceed without risking life imprisonment.

By this theory, even if appellant's understanding of the technique were proven to be right, if he had voiced the view that he was proceeding correctly but yielded to a contrary view, the decision to do so would subject him to the charge he already knew otherwise and so expressed. Likewise, had he stated he thought he was proceeding correctly but stopped at the first sign of disagreement and offered to his colleagues to proceed, none of his colleagues could proceed according to their assessments without later facing the accusation that appellant had warned them, if his view were later shown to be correct.

Also, treating disagreement in the course of treatment or surgery as sufficient to establish knowledge on the part of appellant would lead to potentially absurd results, as all involved could share in the same knowledge. Would the use of deadly force in defense of a third party be applicable to a disagreeing doctor or other medical professional who shot the surgeon? *See* PENAL § 9.33 (defense of third person). Likewise, treating disagreement among medical personnel as sufficient to establish knowledge for these purposes would make the others present in the operating room thereafter at risk of prosecution as parties to the offense if they acted in any way to assist the doctor who moved forward with the surgery.

The unavoidable fact is that physicians, airline pilots, trial lawyers and others who engage in high-risk work are all immediately responsible for difficult and important decisions. They are trained for good reason to voice disagreement and, by necessity, whoever is in charge will be required to select the course forward. If the mere presence of disagreement among them were sufficient, in hindsight, to support the conclusion that the one who acted and was ultimately proven to be wrong was therefore "knowingly" inflicting the harm, the surgeon who held the scalpel at the moment would be compelled to drop it, the objector would be foolhardy to pick it up, and the surgical staff assisting either of them would all be vulnerable to prosecution as principals under our law of parties rules. PENAL § 7.02.

The evidence from Dr. Henderson's evaluation of Ms. Efurd after the July 25, 2012 surgery cannot show that appellant was reasonably certain he was harming Ms. Efurd. Although certainly convincing, given his credentials and confidence, his opinion that appellant must have known he was harming Ms. Efurd amounts to speculation. *See Walker v. State*, PD-1429-14, 2016 WL 6092523, at *16 (Tex. Crim. App. Oct. 19, 2016) (not designated for publication). But that evidence does add to the picture of appellant's appreciation for the risks he was encountering. He clearly became aware at some point during the procedure that his colleagues were correct that he had misplaced the pedicle screw and tried to fix it. But isn't trying to fix it where he caused the harm (or was it already there) what a surgeon is supposed to do? To support a conviction for knowingly inflicting harm, the evidence would have to support the inference that, at that moment, appellant became subjectively aware that he was generally incompetent and that his attempts to fix an injury that was already extant were "reasonably certain" to create additional serious bodily injury—and did. As to the former point, there is no evidence he had someone readily available to fix his mistakes. As to the latter, there's no evidence that his efforts to remediate were the cause of the harm or to explain why this error (potentially a 6th in an unknown total) suddenly meant he appreciated the escalated risk of his performing the repair effort.

What this evidence cannot show is knowing conduct. Dr. Henderson testified that he believed appellant "must have known what he was doing because he did virtually everything wrong." Dr. Henderson went on to testify that a trained neurosurgeon would know, "when they are doing the things to Mary Efurd that [appellant] did, that they're going to cause her serious bodily injury." Dr. Henderson's *ipse dixit* as to appellant's subjective mental state is not even offered as such and would be more properly directed at what he should or ought to have known during the course of the surgery. *See Walker*, 2016 WL 6092523, at *16.

–14–

Ultimately, I am confident the evidence establishes and supports an inference that appellant ought to have known that he was not sufficiently skilled to begin or complete the procedure and, hence, was criminally negligent. PENAL § 6.03(d); *see also Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012) (criminal negligence is established where actor fails to perceive risk).

Before he began the operation, appellant was informed as part of the investigation into the prior bad outcomes at Baylor Plano that he should not operate. While there is no evidence that he knew he was so incompetent that his surgical efforts were "reasonably certain" to cause serious bodily injury to the complainant, the negligence question is broader and includes the question of whether he should have known. *See id.* The majority details the evidence of the investigation into the surgeries he performed on Mr. Summers and Ms. Martin, Baylor Plano's requests that appellant refrain from scheduling surgeries, the testimony of Dr. Hoyle who told appellant that he was dangerous and going to hurt somebody, and the testimony from Dr. Henderson who tried to fix the errors appellant made during the complainant's surgery. This evidence shows appellant should have known before he started the surgery and certainly during the course of it (the numerous holes in the complainant's vertebrae, etc.) that he risked causing the complainant serious bodily injury.

B.     The Closer, More Difficult Question of Whether the Evidence Establishes Appellant's Recklessness

The more difficult question here is whether these earlier mistakes (and criticism) could be adequate to support the inference that before the surgery on Ms. Efurd, appellant actually, subjectively foresaw a risk that, though not quantified to a point approaching a reasonable certainty previously, could now be described as "substantial and unjustifiable," and "consciously" decided to ignore it. *See* PENAL § 6.03(c).

While I reject the State's argument that disagreement in the surgical suite in the midst of the procedure is adequate to show appellant's knowledge that he was performing improperly—and thus knowingly causing harm rather than remediating it—I believe that evidence, combined

with other evidence from before and after his second procedure on Ms. Efurd, establish that appellant consciously disregarded the risk created by his own conduct.

Before appellant made his first incision in his second procedure on Ms. Efurd, he was aware that five of his previous patients had suffered adverse results detailed above. Appellant also knew he had not performed any procedures for four months prior to the week during which he performed Ms. Efurd's surgery, and that of the three procedures he scheduled that week—his patient from the day before was suffering serious complications. Appellant knew Dr. Hoyle believed him to be dangerous and warned that he was "going to hurt somebody." Dr. Hoyle had underscored his point by cancelling his other scheduled procedures with appellant. From the results of his prior procedures and the criticisms of his colleagues, the jury could infer appellant knew he was thought of as incompetent and had had several rarely occurring adverse results occur in a matter of months.

The Chairman of the Peer Review Committee at Baylor Plano testified he informed appellant he would not be allowed to operate at Baylor Plano again. Appellant resigned his privileges at Baylor Plano while he was on a second leave of absence requested by Baylor Plano. From this information, the jury could infer appellant knew his privileges were likely to be revoked and resigned to avoid that revocation. Appellant knew that he had been denied privileges by at least one other hospital between resigning from Baylor Plano and applying to DMC. He knew that when applying for privileges at DMC, he informed the CEO that he had "one complication," not two or three or four, he did not tell her that the complication resulted in death, and he falsely represented on his application that he had not ever voluntarily surrendered his privileges while under investigation. From his deception in applying for privileges at DMC and his denial at another hospital, the jury could infer appellant was aware his record indicated an incompetence that would not be overlooked by a hospital. After his second surgery on Ms. Efurd, he emailed the CEO of DMC that everything was "fine" with Ms. Efurd and that because she had small bones

he was only able to get screws in on one side. From this email, a jury could infer that appellant was aware of his mistakes.

Although an admittedly close question, I would conclude the jury could have concluded appellant acted recklessly, i.e. that he was aware that his incompetence posed a significant danger and chose, without justification, to engage in actions that threatened to bring about that danger. *See Williams*, 235 S.W.3d at 752. I reach this conclusion because the standard for the risks associated with a recklessness charge, that they be "substantial and unjustifiable," does not require quantification and can instead be flexible to the situation. Here, the evidence supports the conclusion appellant is a bungler, that he became aware of his deficiencies, and that he proceeded with the operation on Ms. Efurd despite his awareness of the substantial risks he posed.

## II. Appellant's Broader Objections to the Prosecution Are beyond the Court's Reach

Appellant's brief and argument are replete with broad, policy-based objections to the initiation of this case and the application of section 22.04 to his surgical efforts. As detailed below, I join the majority in rejecting them.

### A. Appellant's Surgical Performance Is Within the Reach of General Criminal Law

As the majority ably notes, the indictment in this case is unique in charging a felony offense that consists of "malpositioning an interbody device . . . and pedicle screws" and using a "deadly weapon, to wit [his] hands and surgical tools . . . ." Appellant first broadly attacks the prosecution at its inception, urging that the filing of criminal charges in this case amounts to an attempt by attorneys representing civil clients to generate publicity and, in turn, increase the value of their civil claims. Construing appellant's argument liberally, as I am obliged to do, I understand appellant to seek recognition of an immunity from prosecution for acts constituting medical practice by a person licensed to engage in the act or omission at issue.

With respect to appellant's specific complaint that this case was initiated without an independent criminal investigation and was prompted or facilitated by the efforts of private attorneys, that argument fails. A district attorney is unquestionably entitled to consult with any resource he or she considers to be useful so long as the charging decision reflects the product of the district attorney's independent judgment. *In re Bexar Cty. Crim. Dist. Attorney's Office*, 224 S.W.3d 182, 187 (Tex. 2007). Likewise, civil attorneys are generally obliged to advance their clients' interests and are free, within ethical limits, to share information with prosecutors. *See* TEX. RULES DISCIPLINARY P. R. 1.05.

More broadly, appellant's counsel laments what she describes as the criminalization of a civil medical malpractice claim. The Legislature, aware of the potentially chilling effects of unconstrained civil liability, has taken efforts to shield medical professionals from the massive potential liabilities and defense costs that would otherwise be inherent to the practice of medicine. Regardless of the alleged degree of mental culpability or harm, a civil damages claim cannot even proceed to discovery without an independent medical expert first endorsing the claim. *E.g.,* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *Heirbierto Sedeno, P.A. v. Mijares*, 333 S.W.3d 815, 818 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (sexual assault); *Mem'l Hermann Hosp. Sys. v. Kerigan*, 383 S.W.3d 611, 614 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (false imprisonment). Thus, as it presently stands, whether the claim is against a dentist seeking $1,000 for a botched filling or one seeking millions of dollars from an anesthesiologist for wrongful death, the medical practitioner is assured of pre-suit notice, the protection of an independent evaluation of the claim, and a right to interlocutory appellate review to assure the competence of that opinion, all before such a case might go forward. Meanwhile, the decision to criminally charge a physician under the statute involved here, be it for knowingly, recklessly or negligently causing serious

bodily injury[10] to a patient rests solely with county and district attorneys sitting over 254 counties who will make charging decisions. I concede that a district or county attorney will present the ultimate decision to indict to lay grand jurors—who, given the need for expert opinion testimony in civil malpractice cases—are presumptively even less capable than lawyers in second guessing medical professionals.

While the concerns associated with this groundbreaking prosecution are real and obvious, this Court's abilities to address them are far less clear. To be sure, courts have undeniably struck out on their own to fashion qualified immunities in a variety of inherent high-risk settings. *E.g., Spalding v. Vilas*, 161 U.S. 483 (1896); *Barr v. Bernard*, 562 S.W.2d 844 (Tex. 1978); *Campbell v. Jones*, 264 S.W.2d 425 (Tex. 1954). Recognizing that these judgments are driven largely by "public policy considerations,"[11] these cases typically reflect a limitation on a judicially created common-law theory of liability or an interpretive gloss on the same statutory scheme that creates the liability. In either case, the decision to recognize an immunity is left, in theory at least,[12] in the hands that are accountable for creating it. What is determinative for my purposes is that these immunities have been recognized almost exclusively in civil, and not criminal contexts.

To that end, judges, prosecutors and police officers all enjoy qualified immunity from *civil* claims on account of the inherent risks associated with their profession and the fear of their otherwise acquitting themselves with "dampened ardor;" none of them, however, enjoys any judicially recognized immunity from criminal prosecution. *E.g., Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982). Meanwhile, apart from a general exemption for "reasonable medical practice,"

---

[10] PENAL §1.07(a)(8) ("'Bodily injury' means physical pain, illness, or any impairment of physical condition.").

[11] *Butz v. Economou*, 438 U.S. 478, 506 (1978).

[12] One might reasonably debate whether creating a civil immunity from the application of a statute is better left in the hands of those who crafted it and remain politically accountable for it. Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797, 1800 (2018).

unique to section 22.04[13] (which I will discuss separately), I find nothing in the plain language of the penal code that would suggest a legislative direction to exempt physicians from its reach.

        B.        Appellant's Surgical Performance Is Also Within the Reach of Penal Code Section 22.04

Appellant also presses the argument that the prosecution does not fit the current form of section 22.04 and its proscription of infliction of bodily injury. To be sure, the context here is awkward as what surgeons do is essentially to inflict bodily injury, albeit in hopes of curing or ameliorating the effects of a disease or deformity. Courts are not in the business of writing statutes, however; instead, we simply apply and interpret them in keeping with the stated directives of the Legislature. Where the Legislature has not spoken to an issue encompassed within the reach of a statute, we are obliged to bring various interpretive aids and canons of construction to bear, all with an aim of determining the Legislature's actual most likely intent. That is not difficult here.

Section 22.04 of the penal code, like many others,[14] has obvious and perhaps unavoidable application to medical procedures. By its terms, it reaches to both "serious" bodily (or mental) injury and simple bodily injury, differentiating the grade of offense only by the mental state of the doctor. Read literally, the statute applies, and would treat as a first-degree felony the intentional or knowing infliction of any bodily injury, which in turn is defined in section 1.07 as any "physical pain, illness or impairment." PENAL §§ 1.07, 22.04(e). But unlike other provisions of the penal code,[15] section 22.04 expressly recognizes its application to medical practice, albeit as a defense to prosecution namely, that the act or omission at issue consisted of "reasonable medical care

---

[13] The existence of such an exemption in this provision at least suggests that the Legislature was aware of its possible application and could presumably decide how to manage other, like prosecutions by, for instance, requiring pre-clearance of the charging decision through some combination of the Office of the Attorney General and the relevant licensing authority.

[14] *See, e.g.*, PENAL §§ 19.01 (types of criminal homicide), 19.04 (manslaughter), 19.05 (criminally negligent homicide), 21.15 (invasive visual recording), 22.01 (assault), 22.02 (aggravated assault), 22.05 (deadly conduct).

[15] Homicide, for example, might be charged where a patient dies as a result of a medical procedure. The definition of the crime, however, does not attempt any restriction of its application to the surgical suite or those who render failed medical treatment, leaving the question whether the result was a possible product of negligence, recklessness, or a knowing appreciating of the surgeon's failings in the hands of charging authorities.

occurring under the direction of *or by* a licensed physician." *Id.* § 22.04(k)(1). While this forecloses any argument as to whether the statute *might* apply to appellant, it is less clear *how* that defense would operate in other cases that would turn on a debate over what amounts to "reasonable medical care."

Section 22.04 is a result-oriented crime, making the outcome of the procedure the target of the crime and leaving application of the exception somewhat uncertain. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Would the exception apply to the "reasonable" execution of the course of treatment, or what one would normally consider non-negligent (i.e., "reasonable") performance of a course of treatment? Or, does it apply to prevent prosecution of higher levels of awareness of the possible or likely results of the procedure or course of treatment itself? It is one thing to excuse a slip of the hand that might otherwise constitute simple negligence during the procedure and another to excuse the decision to proceed in the face of a known or likely risk.

Some difficult questions come to mind. For example, a doctor may be presented with conjoined twins who are minors and the decision whether to proceed with a surgical separation. Would the "reasonable medical care" exception apply only to the manner of his performing the separation, or to the decision to attempt it in the first instance? And, if to the latter, what result would obtain where the physician "knows" that it is "reasonably certain" that one of the twins will not survive surgery but surgery is necessary to save the life of the other? Can the decision to proceed ever be "reasonable" if the act would otherwise amount to a first-degree felony? And, if the decision might be so defended would it be viewed as a matter of law for a court or question of

fact for the jury?[16] Would it matter if one or even if both are likely to die without the separation?[17] While that may be an extreme example, doctors are far more often presented with terminally ill patients and the decision whether to recommend high-risk surgical or pharmaceutical interventions that are almost certain to do collateral harm (i.e., bodily or mental injury in the parlance of penal code section 22.04).

Heart bypass surgery is commonplace today, thanks to the efforts of surgical pioneers like Denton Cooley, Michael DeBakey, and others. But, when those techniques were being developed in Houston and elsewhere, the mortality rate for patients was roughly 50%[18]—meaning that patient death as a proximate cause of the surgery (rather than the disease) approached a likelihood and, arguably the "reasonable certainty" that would trigger a "knowing" finding under 22.04 or its homicide counterpart.[19] Who decides whether proceeding in any these instances is "reasonable?" Doctors, patients (or parents) in accordance with their faith tradition or 254 county and district attorneys?

One presumes that these and other questions may explain why appellate courts in this state have never been presented with a case like this before. To be sure, the charging authorities have selected this case to pursue because they believe it poses the extreme facts to serve well as our test case. The risk, however, is that bad facts all too often make bad law. But the law we apply here, is as the Legislature made it, and, as noted, applies with equal force to this appellant as it does to

---

[16] As postured in my hypothetical, the question would likely be moot as the resulting death would fit under the homicide statute, which includes no "reasonable" medical practice exception. As the question is posed in 22.04 the matter is postured as a defense, which would appear to leave the issue to a lay jury as one of fact, which we review with great deference.

[17] Criminal codes do not generally leave physicians free to make these choices on their own account. *See People v. Kevorkian*, 639 N.W.2d 291, 297 (Mich. Ct. App. 2001) (finding no principled basis to legalize euthanasia).

[18] Allen B. Weisse, M.D., *Cardiac Surgery, A Century of Progress*, TEX. HEART INST. J. 486–90 (2011).

[19] I don't mean to suggest that the Harris County District Attorney at the time would have been so foolish as to attempt a prosecution following one of these deaths. I do question, however, whether Baylor Plano's General Counsel would have permitted these surgeries to take place had this case been pursued (and our decision here published) the year before.

every medical professional and every mistaken (or knowing) decision they might make that results in bodily injury or death.

## III.  Conclusion

In light of the evidence here, I would reverse appellant's conviction for intentionally or knowingly causing an elderly individual to suffer a serious bodily injury, and remand this cause to the trial court (1) to reform the judgment to reflect that appellant acted recklessly in causing an elderly individual to suffer a serious bodily injury and (2) to hold a punishment hearing attendant to this post-reformation conviction. *See Thornton v. State*, 425 S.W.3d 289, 299–300 (Tex. Crim. App. 2014) (requiring appellate court to avoid "unjust result" of outright acquittal by reforming judgment to reflect conviction for lesser-included offense where record reflects sufficient evidence to support conviction for lesser-included offense).

Consequently, I do not join in the majority's opinion and, instead, respectfully dissent from the Court's judgment.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

170235DF.P05