**AFFIRMED and Opinion Filed March 2, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00182-CR**

**DANNY HOWARD SILVERS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F-1714132-H**

## MEMORANDUM OPINION

Before Justices Schenck, Smith, and Garcia
Opinion by Justice Smith

A jury convicted appellant Danny Howard Silvers of murder, and the trial court sentenced him to thirty-five years' imprisonment. On appeal, Silvers challenges the sufficiency of the evidence rejecting his self-defense claim. He also argues the trial court abused its discretion by excluding text messages supporting his self-defense claim. Having reviewed the record, we conclude a rational jury could have found his actions were not justified. We likewise conclude the trial court acted within its sound discretion by excluding the text messages. We affirm the trial court's judgment.

## Background

In September 2017, Jeri, David, and Nick, Jeri's adult son, moved next door to Silvers. A four-foot tall chain-link fence separated the homes. Silvers regularly parked his truck in his driveway, which was next to the fence.

On October 23, 2017, around 6 p.m., Silvers returned home from fishing, parked in his driveway, and left the windows down on his truck. He noticed Jeri's water sprinkler hitting his truck so he confronted her the next time she came out to move it. The two neighbors began a verbal altercation.

David went outside when he heard Jeri and Silvers yelling profanities at each other. David said Silvers threatened to "shoot all three of us and my f- - -ng dog that day." Jeri yelled, "F- - - you" back to Silvers, and then David and Jeri went back inside. Nick returned home from work shortly thereafter, and Jeri expressed her concern about the incident.

Silvers called 911 around 6:13 p.m. Although Silvers told the dispatcher Jeri and David threatened him, he did not indicate any physical altercation or violence occurred. Instead, he reported the profanities. The dispatcher coded the call as a "verbal disturbance" because of foul language.

Four officers responded to the neighbors' dispute. Jeri met Officer Chapa in the street and told him, "I got water on his driveway, so he threatened to shoot me." Silvers denied cussing at Jeri, but instead said it was "all her." Officer Chapa described Silvers as "very, very upset" because Jeri sprayed water on and inside his

truck.  Officers told both sides to stay in their homes and away from each other for the rest of the evening.

After this incident, Silvers approached another neighbor who was playing football in the street.  Silvers told him that "[T]he lady said something early that day . . . that she shouldn't never said, and it was gone [sic] be deadly. . . and on the news."  Silvers told him the situation was going to "escalate" and something bad was going to happen to them.

Silver testified to a different version of the first encounter.  Silvers claimed David and Nick came out and started yelling with Jeri.  Silvers called the police after Nick threatened to "cut my F'ing head off and stuff it down my neck."  Although he thought he told officers about Nick's threat, officers testified to the contrary.  Body cam footage likewise confirmed that Silvers never told officers of any physical threat.  Moreover, a neighbor's security camera captured Nick arriving home after Jeri and Silvers argued.  Silvers admitted talking to another neighbor after the incident, but denied saying things were going to escalate or turn deadly.

Nick later went outside to check on his car because he heard some noise.  Silvers walked from the shadows of his house, gun at his side, and told Nick he was not going to "f- - - with" his car.  Nick called Silvers a coward for threatening them and told Silvers to go inside and leave them alone.

Jeri and David came outside, and they all started name-calling again. Nick told Silvers that "if he wanted to be a man and put his gun down, that we could handle it like men and not have any issues." Silvers refused to fight.

David testified Silvers then walked up to the fence and shot Nick three times, Jeri six times, and him three times. Before Silvers fired, Nick heard him say, "The hell with this." After Nick got hit, he turned to run but bullets severed his vertebra and spinal cord causing him to collapse. He heard Silvers say, "I told y'all, I warned you." Jeri fell within four feet of her side of the fence. Nick managed to call 911 and said, "We've all just been shot." David and Nick were transported to the hospital, and Jeri died at the scene.

Like the first incident, Silvers described the second encounter differently. He said later that night, he went to his backyard to feed his dogs. He grabbed his 9 mm from his nightstand on the way outside because he "wanted to make sure they didn't do something over the fence at me." He then went to the front looking for his cat. He looked under his truck and when he stood up, his three neighbors were standing by the fence. Silvers did not say anything, but they started cussing at him again. Nick repeated his threat to cut off his head and shove it down his throat.

The neighbors started coming around his fence, and he warned them not to. He did not, however, tell them he had a gun.

Once they got within six to eight feet of Silvers, he started shooting. He said then they "turned around real quick and started running." Even after they turned to

run back to their yard, he kept shooting. He wanted to make sure they stopped and would not come back. He said Nick and David dragged Jeri back to their yard before they all collapsed to the ground.

He never saw them with any weapons but assumed they had "like a gun, knife, or bat" because they knew he had guns, and "Why would you be so brave to come at a guy that you know got a gun?"

Silvers called the police and his wife. Officers arrived and saw Silvers in his driveway near the bed of his truck. He told officers, "I told you they came back over there and they come over to the fence threatening to f- - - me up." He said, "I knew one day this was gonna happen." "I can't believe I did it, but I guess damn I did it this time. . . . I told the mother- - - -ers, man. They all three came around the God damn fence, man."

Silvers was taken into custody without incident, and officers tended to the victims and the crime scene. During his ride to the police station, Silvers made unprompted statements like, "I done it. I'm an idiot." He claimed he was threatened, but also said, "I guess I f- - -ing snapped like an idiot."

During his station interview, Silvers said the neighbors came around the fence and threatened to beat him and kill him. He told them for twenty minutes to leave him alone, but they would not do it. He said, "I just can't be threatened like that in my own yard." He told officers he "just snapped" and he did not know "what made

me do it. They just kept on, and on, and on." Silvers said, "that's when they went back on their side of the fence and that's when they went down."

Officer Chapa located shell casings, most of which were on Silvers' property near the fence. Detectives specifically recovered six shell casings from Silvers' side of the fence and two on the other side. Detective Whaley testified he observed blood in the grass next to Jeri's body, but did not observe any near the fence on her side or on Silvers' side of the fence.

Detective Hutson testified there were no blood droplets or smears of any blood evidence that indicated someone was shot on Silvers' property. If a physical struggle had occurred on Silvers' property, Detective Hutson would have expected to find blood on, or leading from, the property.

Officers recovered the 9 mm Smith & Wesson that Silvers used and found a pocket knife in Nick's pants' pocket. Nick testified he used the knife to open boxes at work. He denied ever threatening Silvers with it.

After hearing both sides of the events on the night in question, the jury rejected Silvers' self-defense claim and found him guilty of murder. The trial court sentenced him to thirty-five years in prison.

## Sufficiency of the Evidence

In his first issue, Silvers contends the evidence is legally insufficient to support the jury's rejection of his self-defense claim. The State responds the

evidence is legally sufficient to support the jury's rejection of self-defense because a rational jury could find that Silvers' actions were not justified.

A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a). A "reasonable belief" is one that an ordinary and prudent man would hold in the same circumstances as the actor. *Id.* § 1.07(a)(42).

A defendant has the burden of producing some evidence to support a claim of self-defense. *London v. State*, 325 S.W.3d 197, 202 (Tex. App.—Dallas 2008, pet. ref'd); *see also McAlister v. State*, No. 05-19-00704-CR, 2020 WL 7767936, at *3 (Tex. App.—Dallas Dec. 30, 2020, no pet.) (mem. op., not designated for publication). The State has the burden of persuasion in disproving self-defense. *London*, 325 S.W.3d at 202. Self-defense is an issue of fact to be determined by the jury. *Id.* A jury's guilty verdict is an implicit finding rejecting the defendant's self-defense theory. *Id.*

Because the State bears the burden of persuasion to disprove self-defense by establishing its case beyond a reasonable doubt, we review legal sufficiency challenges to the jury's rejection of such a defense under the *Jackson v. Virginia* standard. *McAlister*, 2020 WL 7767936, at *3. In resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing

all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018).

Further, the reviewing court must defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony, as the jury is the sole judge of such matters. *Mitchell v. State*, 590 S.W.3d 597, 604 (Tex. App.— Houston [1st Dist.] 2019, no pet.). We must likewise be mindful that self-defense is a fact issue to be determined by the jury, and it is free to accept or reject any defensive evidence on the issue.

Silvers has not challenged the sufficiency of the evidence to support the elements of his murder conviction. Rather, he argues no rational juror could have found beyond a reasonable doubt that he did not reasonably believe the use of deadly force was immediately necessary to protect himself from his neighbors' use or attempted use of unlawful force. He points to the following evidence in the record:

- Nick threatened to cut of his head and shove it down his throat. Because of this threat, Silvers took his gun with him outside when he went to feed his animals.

- David threatened him with a knife months earlier.

- The neighbors kept walking towards him despite him telling them to stop. Because David had threatened him months earlier with a knife and Nick threatened him earlier that day, Silvers had good reason to believe the neighbors might be armed.

–8–

- When the neighbors walked around the fence and entered Silvers' property, he felt threatened and started shooting.

Silvers contends he had "no choice but to regard the three as a threat" and from his perspective, the threat was "palpable" as they advanced onto his property.

We conclude there is sufficient evidence to support the jury's rejection of Silvers' version of the events that evening. David and Nick testified that they never threatened Silvers in the past or on the day of the incident. Video footage from a neighbor's home showed that Nick was not present during the first altercation when Silvers claimed that Nick threatened to cut off his head and shove it down his throat. While Nick admitted to having a knife in his pants' pocket that night, he testified he used it for opening boxes at work and not for threatening Silvers. In fact, Silvers never told officers Nick made any such threat.

David and Nick testified they never crossed over the fence into Silvers' yard. Physical evidence at the scene supported their testimony. Most of the shell casings were recovered close to Silvers' side of the fence and a couple were close to Jeri's side of the fence, which indicated the shooter stood near the fence and shot into the victims' yard. There was no blood on Silvers' side of the fence to support his testimony that he shot them on his side, and they ran from his yard or they dragged Jeri back to their yard. Rather, most of Jeri's gunshot wounds were in her back indicating she was shot when she turned away from the fence. Nick's vertebra and spinal cord were severed from his gunshot wounds making it unlikely that he ran

from Silvers' yard back to his side of the fence before falling. The evidence indicated Silvers shot them on their property, not his.

In fact, Silvers admitted during his police interview "when they went back on their side of the fence . . . that's when they went down." Silvers also said in his interview he "just snapped," and he did not know "what made me do it. They just kept on, and on, and on." The jury could have credited these statements made to the police shortly after the shooting as an admission that self-defense was not justified and discredited his self-serving testimony at trial. Moreover, while Silvers' testimony suggests the neighbors' verbally threatened him, verbal provocation does not justify self-defense. *See Braughton*, 569 S.W.3d at 606; *see also Hernandez v. State*, No. 05-15-00198-CV, 2016 WL 1446269, at *3 (Tex. App.—Dallas Apr. 12, 2016, pet. ref'd) (mem. op., not designated for publication).

The jury essentially heard two versions of events leading up to the deadly shooting. They considered all the evidence, including but not limited to, the verbal threats, the weapons found at the scene, the physical evidence, and testimony from neighbors indicating that Silvers had problems with several of the neighbors on the street. The jury, as the judge of witness credibility, was free to believe or disbelieve any witness, including Silvers. *See Mitchell*, 590 S.W.3d at 604. Accordingly, we conclude the jury rationally could have rejected Silvers' claim of self-defense.

In reaching this conclusion, we reject Silvers' argument that because he believed he had to use deadly force, the jury had to acquit him. He contends only

–10–

he "could speak with any authority as to what the circumstances were from his standpoint." While this may be true, the jury was still free to disbelieve his testimony. We acknowledge that affording deference to the jury's credibility determinations is not without limits. Rather, "[a] jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all the evidence." *Braughton*, 569 S.W.3d at 611. But here, after reviewing the record, we do not see any aspect that would render the jury's credibility determinations irrational in light of these principles. We overrule Silvers' first issue.

## Exclusion of Evidence

In his second issue, Silvers argues the trial court abused its discretion by excluding text messages in which David threatened him after the offense. The State responds the trial court acted within its discretion by excluding the text messages because they were irrelevant.

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Duntsch v. State*, 568 S.W.3d 193, 215 (Tex. App.—Dallas 2018, pet. ref'd). The trial court abuses its discretion when the decision falls outside the zone of reasonable disagreement. *Id*.

During Detective Hutson's cross-examination, defense counsel asked if he had exchanged text messages with David since the incident. Detective Hutson said

–11–

yes, but he eventually stopped responding to them. Counsel began asking, "In some of these text messages, has David Bailey threatened - -," but the State objected as irrelevant.

Outside the jury's presence, defense counsel argued the evidence was relevant as to whether David threatened Silvers' life on the night of the shooting. The State argued the texts were irrelevant because David sent them after the offense, and they were improper character evidence. The trial court sustained the State's objection.

On appeal, Silvers argues he was prevented, in violation of article 38.36 of the code of criminal procedure, from exploring David's continual threats to kill him, which went to his state of mind on the night of the offense. He also argues he was denied his constitutional right of confrontation.

Silvers did not preserve his constitutional right to confrontation argument for review because he failed to raise this objection to the trial court. TEX. R. APP. P. 33.1. He argued the evidence was relevant; however, his evidentiary objection did not put the trial judge on notice that he was making a Confrontation Clause objection. *See Reyna v. State*, 168 S.W.3d 173, 178 (Tex. Crim. App. 2005). Because Silvers did not "clearly articulate" that the Confrontation Clause demanded admission of the evidence, the trial court never had the opportunity to rule upon it. *Id.* As such, we do not address it on appeal. *See* TEX. R. APP. P. 33.1.

We now consider whether the excluded evidence was relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of

consequence to the determination of an action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. If no issue in the case could be influenced by the proffered evidence, then the evidence is irrelevant and therefore inadmissible. *See Henley v. State*, 493 S.W.3d 77, 84 (Tex. Crim. App. 2016).

Silvers' stated purpose for offering the text messages would not have helped decide a fact of consequence in this case, specifically, whether he believed David was a threat on the night in question, which justified his use of deadly force to protect himself. To be justified in using deadly force in self-defense, a person must reasonably believe the force is immediately necessary to defend himself. *See* TEX. PENAL CODE ANN. § 9.32(a). The threatening texts messages were sent after the murder, and there is no evidence when or if Silvers learned about them; therefore, the text messages could not have influenced or justified his actions on the night of the murder. Because the text messages were not logically connected to any issue in the case, the trial court acted within its discretion by excluding them.

In reaching this conclusion, we likewise reject Silvers' reliance on article 38.36(a). Article 38.36(a) provides that:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX. CODE CRIM. PROC. ANN. art. 38.36(a). The text messages are not evidence of a "previous relationship between the accused and the deceased." Neither Detective

Hutson nor David are "the accused" or "the deceased." Moreover, text messages between Detective Hutson and David would not "show the condition of the mind of [Silvers] at the time of the offense." We overrule Silvers' second issue.

## Conclusion

After reviewing the record and overruling Silvers' sufficiency and evidentiary challenges, we affirm the trial court's judgment.

/Craig Smith/
CRAIG SMITH
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
200182F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DANNY HOWARD SILVERS,
Appellant

No. 05-20-00182-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 1, Dallas County, Texas Trial Court Cause No. F-1714132-H. Opinion delivered by Justice Smith. Justices Schenck and Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered March 2, 2021