**Opinion issued April 17, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00263-CR**

———————————

**CHRISTOPHER ODEKU, The appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 208th District Court**
**Harris County, Texas**
**Trial Court Case No. 1485915**

---

## O P I N I O N

A jury found the appellant, Christopher Odeku, guilty of sexual assault, assessed punishment at confinement for ten years, and recommended that he be placed on community supervision. The trial court sentenced the appellant the

appellant consistent with the jury verdict, suspended the sentence, and placed him on community supervision for 10 years.

On appeal, the appellant contends the trial court violated the Confrontation Clause rights under the federal and state constitutions and Texas Rules of Evidence 403 and 404, by admitting extraneous-offense evidence from sexual assault nurse examiner (SANE) records about another alleged sexual assault.

We hold that the trial court did not err in admitting the evidence and affirm.

## Background

### Sexual assault of the complainant

The complainant testified that in June 2015, she was a college student in her senior year at University of Houston-Downtown. A year earlier, she met the appellant, who was using the alias "Christopher English," on a dating website. They chatted online "a little bit." They did not meet in person, but became Facebook "friends" and "occasionally exchanged brief greetings." In the meantime, the complainant began dating someone else and deleted her profile from the dating site.

In May 2015, the appellant messaged the complainant on Facebook. She informed the appellant that she was single again. They resumed chatting online and made plans to meet on the complainant's school campus in late May, but the appellant did not show up and told her that his "ride never showed."

2

On the evening of June 5, 2015, the complainant was studying for the Graduate Record Exam (GRE) at her studio apartment in a four-unit building near campus. The appellant had messaged her earlier that day, asking how she was doing. She told him that she was studying for the GRE, was not dressed to leave her apartment, and had "a lot going on." The appellant responded that he "would really like to see [her]." He sent her another message, and she told him again that she was "busy" and "focused on studying."

The appellant then video-called the complainant. He repeated that he "would like to see [her]" and asked if she could "get dressed up" so he could come see her. The complainant refused, telling the appellant that she was not going to get dressed up and was still studying.

The appellant said again that he would like to see her, and she responded that if he was going to see her right then, she was going to be studying. The appellant told her that he was also studying for grad school and asked to "come by and study" with her. The complainant told the appellant that he could come by later that evening and they could get coffee at a nearby shop.

At about 5:00 p.m., the appellant sent the complainant a text message that he was on her street. She met him on her front lawn because she "was hesitant to meet him in person anywhere that wasn't public." They stood outside and talked for about

3

an hour. The appellant told her a little about his life, and he petted a neighbor's dog. The complainant thought that the appellant seemed like a "charming individual."

As it got later in the evening, mosquitoes became active, and the complainant suggested that they go get coffee. The appellant said, "Well, I have to study and you have to study. Why don't we go up to your apartment?" The complainant hesitated but thought that the appellant "seem[ed] like a nice guy," so she decided to let him into her apartment. They sat on her futon sofa and talked. After a little while, the complainant pulled out her study materials and asked the appellant "well, where are you going to study?" The appellant pulled out an iPad but kept trying to talk to the complainant.

When the appellant started rubbing her shoulders and started to cuddle her, the complainant was "okay with that at the time." She had previously told the appellant that she didn't want "anything physical" with him because of "bad relationship experiences." She thought that they might "hug or kiss" but she first wanted to get to know him as a person.

The appellant kissed her and she was "okay" with that; they kissed for a little while but then he "started looking at her a certain way." She pulled away from him and reminded him several times that she didn't "want anything physical" with him, that she just wanted to study. But then, the appellant grabbed the complainant around the hips and pulled her closer, began "making out" with her and had his hands all

4

over her, "overwhelming" her. After a while, she "was just making out with him so he would calm down and get off of her.

Eventually, the appellant got up from the sofa. He took off his shirt, showed her a scar on his back, and told her about it. The complainant asked the appellant to put his shirt back on. He refused, then unzipped his pants and pulled out his penis. The complainant repeated that she didn't want to have sex with the appellant, reminded him that she had told him that "multiple times," and said again that she was not interested.

The appellant then tried to rub his penis against her and she protested again, telling him that she was not comfortable and was going to make him leave. The appellant pulled the complainant's hand down to his penis, and she repeated that she didn't want to have sex with him and if he didn't stop, she would make him leave. The appellant started to put his penis back in his pants, and the complainant told him that he needed to put all his clothes back on, but he refused, saying that it was "too hot."

The appellant then lay down between the complainant and the back of the futon sofa with his legs and arms across her. The appellant then said that he wanted to see the complainant's scars, and he "kind of manhandle[d]" her. He reached up into her shirt, and she felt him pull on her bra until it came undone. The complainant told him, 'No. I don't want to take my [b]ra off.' The appellant said, "well, I know

5

you have scars."[1] Then he pulled the complainant's pants down and penetrated her vagina with his penis from behind.

Next, the appellant pulled the complainant's tank top and grabbed her hair. Her head, hair, and arms became stuck in her shirt; the neckline was wedged under her neck, and the complainant couldn't move her arms. She felt like she was in shock. The appellant held onto the complainant's hair and her shirt and continued to penetrate her vagina from behind.

The complainant felt the appellant let go of her hair a bit and she managed to push the shirt out of the way and pull her head out. She was able to free one arm and pull her head out of the shirt. She noticed a poster on her wall with her picture from an HIV advocacy event she had participated in, and said to the appellant, "Well, you're playing Russian roulette now." The appellant saw the poster and asked her, "What do you mean?" "What do you have?" and then pulled off of her.

The complainant ran to her kitchen and began crying. The appellant followed her, asking her, "Oh honey, what is wrong? Oh, are you okay?" He was "acting like nothing happened." She told him that she was "just shook up" and said, "let's go back to the living room." She was in shock and didn't know what to do. They sat for a bit, then she asked the appellant, "Can you get a ride?" but the appellant kept

---

[1]     The complainant explained that she had previously told the appellant that she had surgical scars on her legs.

petting her hair and calling her sweetie. She kept passing out because of the shock, and every time she woke up from passing out, the appellant "would be laying there with his iPad" either taking photos of her or just pointing it at her. Eventually, a car came for the appellant, and he left.

The complainant woke up early the next morning and texted a friend. The friend called the complainant's mother, who called 9-1-1, drove to her daughter's apartment, then accompanied her to the hospital, where the complainant was examined by a nurse and medical doctor.

**Extraneous evidence of another sexual assault by the appellant**

The State proffered evidence of another alleged sexual assault by the appellant to go to the issues of lack of mistake and intent in response to the appellant's argument that the complainant consented to have sex with the appellant. After hearing argument, the trial court admitted the evidence through the testimony of Houston Police Department (HPD) Detective A. Agravante and SANE Lori Long.

In January 2018, Detective Agravante of HPD's Adult Sex Crimes Unit was assigned to investigate a sexual assault reported by Mary Smith.[2] The morning of

---

[2] We use a pseudonym for this assault victim, as nothing would be gained by using her full name in this opinion. *See* TEX. CONST. art. I, § 30(a)(1) ("A crime victim has the . . . right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process."); *see also* TEX. R. APP. P. 9.8 cmt. (recognizing appellate court's authority to disguise identities in appropriate circumstances).

January 25, 2018, emergency medical services (EMS) brought Smith to Memorial Hermann Memorial City Hospital for examination and treatment.

According to EMS records, Smith stated she was out drinking the night before with some friends. She took a drink out of some guy's flask and didn't remember anything until she woke up. The guy with the flask had a British accent. She woke up with no pants or underwear on and two black guys were asking her to perform sex acts on them. Smith called 911 when she got to her apartment. She was advised to go to the emergency room to be evaluated.

The triage records from the emergency room, which were also admitted, were largely consistent with the EMS records. Smith also reported that she eventually went home with the man who had given her some drink and recalled declining sexual advances from him, but was unable to remember.

Other medical records identified "Christopher English" as the alleged suspect. Agravante's investigation led her to identify the appellant as a possible suspect based on HPD records. Agravante obtained an arrest warrant for the appellant and took a DNA sample from him. She later learned that Smith had died from a drug overdose.

Long testified that she has been a practicing SANE for the Memorial Hermann Healthcare System since 2015. She explained that when conducting a SANE exam, the first thing she did after obtaining consent from the patient was to "get a history of what brought them into the emergency room" so that the patient could receive

8

comprehensive care, including "things like medication to prevent pregnancy, diseases, sexually transmitted infections, HIV, as well as advocacy services to address any subsequent psychological and mental health results that they may have as an impact." As a SANE, Long also did a head-to-toe physical assessment, a "detailed genital assessment," and then did evidence collection.

On January 25, 2018, Long conducted a SANE exam of Smith. Long explained that she wrote down Smith's history of the assault verbatim as Smith told her what happened. Long then read what she had written to the jury.

According to Long's notes, Smith stated that the night before, she was at a club in Montrose with two coworkers. Smith had two drinks and a shot. A little before 2:00 a.m., a black man with a strong English accent, whom Smith later identified as "Christopher," came up to her and said, "I've been watching you all night. You are so beautiful." He asked if she wanted to go smoke a cigarette, and they went outside. He pulled out a flask, said it was bourbon, and asked Smith if she wanted a drink. Smith took it and drank "like a shot." She thought it tasted like bourbon.

Smith's coworkers were ready to leave by 2:00 a.m., but Smith was tipsy and wasn't ready to go. Christopher, who "was being so polite," invited her to go with him to an afterparty at another club. He got them an Uber to the club and told her that two girls would be meeting them there.

9

After they arrived at the next club, Smith drank about a half a cup of light beer, but she was uncomfortable because "[e]veryone was in the unisex bathroom doing drugs," so Christopher got another Uber, this time to what he said was his friend's home. Christopher told her that "a bunch of people were coming," but when they arrived, no one else was there.

Christopher pulled his penis out and put his hand on the back of Smith's head and said "Come suck it. You make me horny. You're so beautiful." Smith responded, "No, I'm not here for that." Smith had a headache and her mouth was dry, so she asked for ibuprofen and a bottle of water. She got dizzy after she drank the water, and her memory was faulty after that. She remembered a "flash" of being naked from the waist down in the apartment and Christopher was behind her with his penis in her vagina. She also remembered seeing another black man in the room with a large iPad. She asked, "Who is here?" and Christopher responded, "No one." Then Smith blacked out again, then recalled seeing Christopher leave the apartment. She was in her bra and shirt searching for her jeans and underwear. Another guy in the apartment tried to get her to suck his penis, and she told him "Where is Chris? Get the fuck away from me." When Christopher didn't return, she got an Uber to her apartment. Smith got home about 7:30 a.m. and called 9-1-1.

**Discussion**

**A.     Admission of the SANE's Testimony Did not Violate the Confrontation Clause**

In his first, second, and third issues, the appellant asserts that the admission of Long's testimony about Smith's statements recorded in the SANE report, the EMS records, and other medical records violated his constitutional right to confront witnesses against him guaranteed by the United States and Texas constitutions. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The appellant cannot now raise an argument that the Texas constitution provides different or greater protection than the federal constitution because he did not raise that argument in the trial court. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (holding argument that Texas constitution provided greater protection than federal analogue must be raised in trial court to be preserved for appeal).

Under the Sixth Amendment's Confrontation Clause, testimonial statements made by a non-testifying witness are inadmissible unless the witness is unavailable to testify and the defendant has had a prior opportunity for cross-examination. Consistent with this constitutional right, out-of-court statements offered against the accused that are "testimonial" may be excluded unless the prosecution shows that the declarant is unavailable to testify in court and the accused had a prior opportunity

to cross-examine the declarant. *Ohio v. Clark*, 576 U.S. 237, 243 (2015); *Langham v. State*, 305 S.W.3d 568, 575–76 (Tex. Crim. App. 2010).[3]

Whether an out-of-court statement is testimonial is a question of law. *Langham*, 305 S.W.3d at 576. "Although we defer to the trial court's resolution of credibility issues and historical fact, we review *de novo* the ultimate constitutional question of whether the facts as determined by the trial court establish that an out-of-court statement is testimonial." *Id.*

In our review, we consider "whether 'the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* (quoting *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008)). The "primary purpose" is the "'first in importance' among multiple, potentially competing purposes" for a statement. *Id.* at 579. "In the end, the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Clark*, 576

---

[3]    The appellant spends part of his brief arguing that current Supreme Court interpretation of the Sixth Amendment is less restrictive than the Sixth Amendment's original meaning at the time of its adoption. But "[w]hen we decide cases involving the United States constitution, we are bound by United States Supreme Court case law interpreting it." *State v. Guzman*, 959 S.W.2d 631, 633 (Tex. Crim. App. 1998); *see also Ex parte Argent*, 393 S.W.3d 781, 784 (Tex. Crim. App. 2013) ("[W]hen a state court chooses to address the merits of a federal claim, its decision to grant or deny relief must accord with federal law.").

U.S. at 245 (internal quotation omitted). "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* at 245–46 (internal quotation omitted).

Medical reports created for treatment purposes are usually non-testimonial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009); *Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd); *see also Clark*, 576 U.S. at 246 ("[S]tatements to individuals who are not law enforcement officers . . . are much less likely to be testimonial."); *Davis v. State*, 169 S.W.3d 660, 667 (Tex. App.—Austin 2005) (Onion, J.) ("A statement is more likely to be testimonial if the person who heard, recorded, and produced the out-of-court statement at trial is a government officer."), *aff'd*, 203 S.W.3d 845 (Tex. Crim. App. 2006).

The appellant argues that the statement recorded by Long is testimonial because 1) Smith specifically requested the exam in the presence of the police and told the emergency room physician that she would be filing a police report; 2) the patient education packet given to Smith before the SANE exam explained the examination process, told Smith that samples would be taken from her body "for evidence" that "may be used if you choose to take legal action (press charges) at a later time"; 3) in signing the consent form, Smith expressly consented for Long to perform a "medical forensics examination" and "collection of evidence," and authorized the hospital to release copies of the SANE report to a law enforcement

agency. Consistent with other Texas courts of appeals that have considered the issue, though, this Court has already concluded that when a patient gives a verbal history to a SANE or other medical professional during a sexual assault exam for the purpose of receiving medical treatment, the history is not considered testimonial. *See Kirkman v. State*, No. 01-18-00978-CR, 2020 WL 2026372, at *3, *5 (Tex. App.—Houston [1st Dist.] Apr. 28, 2020, pet. ref'd) (mem. op., not designated for publication).[4] None of the arguments raised by the appellant shows that Smith's SANE exam should be treated differently. A person undergoing a SANE exam provides a verbal history to a medical professional for the primary purpose of

---

[4]     When this Court decided *Kirkman*, it observed that five other Texas courts of appeals had already held that doctors' and nurses' observations and notes recorded in a SANE medical record are not testimonial because they are for the purpose of diagnosis and treatment. *See DeLeon v. State*, No. 13-18-00480-CR, 2019 WL 4200297, at *2 (Tex. App.—Corpus Christi-Edinburg Sept. 5, 2019, pet. ref'd) (mem. op., not designated for publication); *Metoyer v. State*, No. 13-18-00573-CR, 2019 WL 3331634, at *2 (Tex. App.—Corpus Christi-Edinburg July 25, 2019, pet. ref'd) (mem. op., not designated for publication); *Garrett v. State*, No. 12-15-00208-CR, 2017 WL 1075710, at *3 (Tex. App.—Tyler Mar. 22, 2017, no pet.) (mem. op., not designated for publication); *Urias v. State*, No. 08-12-00090-CR, 2014 WL 1259397, at *5 (Tex. App.—El Paso Mar. 26, 2014, pet. ref'd) (mem. op., not designated for publication); *Chin v. State*, Nos. 04-13-00242-CR & 04-13-00243-CR, 2013 WL 6869905, at *4 (Tex. App.—San Antonio Dec. 31, 2013, pet. ref'd) (mem. op., not designated for publication); *Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd). Since *Kirkman* was issued, two more Texas courts of appeals, relying on *Kirkman* among other cases, have reached the same conclusion. *See Trollinger v. State*, No. 11-22-00089-CR, 2023 WL 5622111, at *3 (Tex. App.—Eastland Aug. 31, 2023, no pet.) (mem. op., not designated for publication); *Franklin v. State*, No. 02-21-00088-CR, 2022 WL 3651972, at *3 (Tex. App.—Fort Worth Aug. 25, 2022, pet. ref'd) (mem. op., not designated for publication).

obtaining medical treatment, whether or not the person intends to report the sexual assault to the police and even though the exam creates evidence that might be used in a prosecution.

Here, the record supports the same conclusion we reached in *Kirkman*. Before testifying from her notes on her examination of Smith, Long explained that a SANE exam has both forensic and medical components. The SANE first takes a history from the patient about what brought the patient into the emergency room and "document[s] verbatim" what the patient says "for the purposes of diagnosis and treatment." Long explained that she did not interview Smith; an interview was "a whole different forensic process" for "somebody else" to do. Long obtained a history from Smith "specifically for the purposes of diagnosis and treatment as a healthcare provider." Any questions Long asked while Smith was recounting events were just to clarify things that Smith said, like what she had to drink or which bar Smith was at when the events she described took place.

For these reasons, we conclude that Smith's statement to Long was non-testimonial. As a result, we hold that the trial court did not err in ruling that the admission of the evidence through Long did not violate the Confrontation Clause.

We overrule the appellant's first, second, and third issues.

**B.** **The Admission of the Extraneous-Offense Evidence Did not Violate Texas Rules of Evidence 403 and 404(b).**

In his fourth, fifth, and sixth issues, the appellant argues that the trial court reversibly erred in admitting evidence of the sexual assault described by Smith because it was not "sufficiently similar" to the sexual assault described by the complainant to prove intent and any probative value was substantially outweighed by the danger of unfair prejudice and confusing the issues.

We review a trial court's ruling on whether to admit extraneous-offense evidence for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). We will not reverse a trial court's evidentiary ruling unless it falls outside the zone of reasonable disagreement. *Id.* at 343–44. If the trial court's ruling can be justified on any applicable theory of law, we will not disturb it. *Id.* at 344.

Extraneous-offense evidence is admissible under both Rules 403 and 404(b) if 1) the extraneous-offense evidence is relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character, and 2) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Page v. State*, 213 S.W.3d 332, 335 (Tex. Crim. App. 2006). If the accused is given reasonable notice of the State's intent to introduce extraneous-offense evidence, it is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b); *Lauderdale v. State*, No. 01-13-00539-CR, 2014 WL 6679634, at *7–

8 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet.) (mem. op., not designated for publication). Extraneous-offense evidence may also be admissible to rebut a defensive theory, but it must be similar to the charged offense. *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003); *see Plante v. State*, 692 S.W.2d 487, 492–93 (Tex. Crim. App. 1985). Whether extraneous-offense evidence has relevance apart from character conformity is a question for the trial court. *Moses*, 105 S.W.3d at 627.

A defendant can raise a defensive theory and open the door to admission of extraneous-offense evidence during his opening statement, his cross-examination of the State's witnesses, or through evidence admitted in his case-in-chief. *De La Paz*, 279 S.W.3d at 344–45; *Fisher v. State*, No. 05-19-00851-CR, 2022 WL 2900968, at *8 (Tex. App.—Dallas July 22, 2022, pet. ref'd) (mem. op., not designated for publication).

When a defendant's intent is at issue, extraneous-offense evidence may be used to show intent if intent cannot be inferred from the act.[5] *Duntsch v. State*, 568 S.W.3d 193, 222 (Tex. App.—Dallas 2018, pet. ref'd); *Jones v. State*, 716 S.W.2d 142, 161 (Tex. App.—Austin 1986, pet. ref'd). If the defendant raises the defensive

---

[5] Extraneous-offense evidence may also be used when a defendant places identity at issue under the doctrine of chances, which applies when there is a similarity between the charged and extraneous offenses. *See De La Paz*, 279 S.W.3d at 347; *Pedraza v. State*, No. 01-19-00652-CR, 2020 WL 3866660, at *5 (Tex. App.—Houston [1st Dist.] July 9, 2020, pet. ref'd) (mem. op., not designated for publication).

theory of consent in a prosecution for sexual assault, he places at issue his intent to engage in the alleged conduct without the victim's consent. *Martin v. State*, 173 S.W.3d 463, 466 n.1 (Tex. Crim. App. 2005); *Fisher*, 2022 WL 2900968, at *8; *see* TEX. PENAL CODE § 22.011(a)(1), (b).

The appellant does not dispute that he raised the issue of the complainant's consent throughout his case-in-chief but argues that the trial court erred in admitting, through Long, Smith's description of her sexual assault by the appellant because it was not sufficiently similar to the sexual assault that the complainant described in her testimony. He notes that in contrast to the sexual assault described by Smith, the complainant's description of her sexual assault by the appellant did not involve drinking or doing drugs, she and the appellant were previously acquainted, there was some consensual cuddling and kissing, the appellant remained after the sexual assault and "tried to console" the complainant, and the complainant continued to communicate with the appellant in the days that followed.

The appellant is correct that some similarity between the extraneous offense and the charged offense is required for the extraneous-offense evidence to be admissible. *Brown v. State*, 96 S.W.3d 508, 512–13 (Tex. App.—Austin 2002, no pet.). But if the defendant's intent is the material issue, as it is here, the degree of similarity between the charged offense and the extraneous offense need not be as

18

great as when identity is the material issue. *See Duntsch*, 568 S.W.3d at 222; *Brown*, 96 S.W.3d at 512–13.

The similarities between the appellant's sexual assault of the complainant and that of Smith are greater in number and more significant than the differences identified by the appellant. Both women initially agreed to spend time with the appellant. The appellant introduced himself to both women by the alias "Christopher English." Also, both assaults occurred late at night, shortly after the women met the appellant in person for the first time. Both times, the appellant pulled out his penis unexpectedly in front of the woman. Each woman rejected the appellant's sexual advances, yet the appellant continued to pursue sex as if she hadn't. And each described having had the appellant penetrate her vagina with his penis from behind. Further, the complainant testified that the appellant did not use a condom and while Smith did not recall whether he had used a condom, testing after the SANE exam showed he had not. Finally, after both assaults, both the complainant and Smith recalled that they were photographed with an iPad. We conclude that these similarities support admission of the extraneous offense under Rule 404(b).

Even if evidence is relevant and is being offered for a permissible purpose under Rule 404(b), the trial court may still exclude it if its probative value is substantially outweighed by the danger of unfair prejudice. *Moses*, 105 S.W.3d at 626; *see* TEX. R. EVID. 403. But Rule 403 "should be used sparingly to exclude

19

relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant" in a "'he said, she said' case[]." *Hammer v. State*, 296 S.W.3d 555, 562–63 (Tex. Crim. App. 2009); *Bradshaw v. State*, 466 S.W.3d 875, 883–84 (Tex. App.—Texarkana 2015, pet. ref'd).

In applying Rule 403, we consider: 1) the evidence's probative value; 2) its potential to impress the jury in some irrational yet indelible way; 3) the time needed to develop the evidence; and 4) the proponent's need for it. *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). Here, because of similarities between the two sexual assaults, the evidence of Smith's assault by the appellant had a high probative value.

As for the evidence's potential to impress the jury "in some irrational but indelible way," such as character conformity, that potential can be minimized by the use of a limiting instruction. *McGregor v. State*, 394 S.W.3d 90, 120–21 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). After the extraneous-offense evidence was admitted and again in the charge, the trial court instructed the jury:

> that if there is any evidence before you in this case regarding the defendant 's committing an alleged offense or offenses other than the offense alleged against him in the indictment in this case , you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining the motive, opportunity , intent , preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense , if any, alleged against him in the indictment and for no other purpose.

We presume the jury followed this instruction. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

The third factor contemplates "the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense." *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005). Here, the extraneous-offense evidence took up one day of a four-day trial. This amount of time is significant relative to the rest of the trial and thus weighs against admission, but given that the State otherwise had to rely principally on the testimony of the complainant to make its case, the proportion of time spent on it had more to do with the brevity of the other evidence than any undue amount of extraneous-offense evidence.

The need for the extraneous-offense evidence was high because not only did the appellant raise the issue of consent as a defense, the complainant testified that she and the appellant had engaged in some consensual hugging and kissing before he assaulted her. In the absence of other witnesses, the extraneous-offense evidence helped the jury to decide whether the defendant or the complainant was more credible. *See Hammer*, 296 S.W.3d at 562–63.

We hold that the trial court did not err in concluding that the extraneous-offense evidence was admissible under Rules 403 and 404(b).

We overrule the appellant's fourth, fifth, and sixth issues.

## Conclusion

We affirm the judgment of the trial court.


Clint Morgan
Justice

Panel consists of Justices Guerra, Caughey, and Morgan.

Publish. *See* TEX. R. APP. P. 47.2(b).